IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| AMBAC ASSURANCE CORPORATION,<br><br>       Plaintiff,<br><br>   -against-<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>       Defendant. | Civil No. 16-cv-_____ |

## **COMPLAINT**

    Plaintiff Ambac Assurance Corporation ("Ambac"), by and through its attorneys Ferraiuoli LLC, and Milbank, Tweed, Hadley & McCloy LLP, for its Complaint against Defendant Puerto Rico Highways and Transportation Authority ("PRHTA" or the "Authority"), allege as follows:

## **NATURE OF THIS ACTION**

    1.  PRHTA has been in severe financial distress for several years.  In performing PRHTA's audit for fiscal years 2013 and 2014, PRHTA's independent auditors questioned the Authority's ability to continue as a going concern, noting that the Authority could not meet its obligations as they came due.  PRHTA itself admitted that future defaults may be unavoidable.  Recent executive orders issued by the Governor of the Commonwealth of Puerto Rico (the "Commonwealth") requiring "clawback" of funds pledged to PRHTA have further exacerbated PRHTA's dire financial condition.  Despite its precarious state, PRHTA recently agreed to sell assets worth over $100 million, even though, under Puerto Rico law, it has no control over the use of the proceeds from that sale.  Plaintiff does not challenge the terms of the transaction (the

"Concession Extension") and are not seeking any relief that would have the effect of unwinding the Concession Extension.  Nevertheless, PRHTA's sale of valuable assets knowing that any proceeds would likely be siphoned off by the Commonwealth government constitutes the latest in a series of breaches of fiduciary duties owed to Plaintiff under PRHTA's enabling act, *see* 9 L.P.R.A. § 2013(a)(2), and contractual duties owed to Plaintiff under the PRHTA resolution authorizing the issuance of certain PRHTA bonds.

2.       On or about April 21, 2016, the Authority entered into the Concession Extension with its public-private partnership ("P3A") partner Autopistas Metropolitanas de Puerto Rico LLC ("Metropistas"), agreeing to amend an existing concession agreement for two toll highways in Puerto Rico (PR-22 and PR-5) and extend the lease by ten years.  PRHTA has not released information stating, or even suggesting, that the Concession Extension was a time-sensitive corporate opportunity that would be lost if not undertaken now.  Through this transaction, PRHTA agreed to reduce, from 50% to 25%, its allocated share of toll revenues generated by the dynamic-pricing toll system on PR-22.  In exchange, the Commonwealth of Puerto Rico—and not PRHTA—stands to receive $115 million.  Indeed, the funds that PRHTA raised through the Concession Extension are likely to go right out the door—conferring *no* benefit on the Authority or its bondholders.  Because it monetized its interest in PR-22 and PR-5 through a P3A, PRHTA does not have the right to retain, or even to direct the use of, the consideration that it received. Instead, under Section 17 of Act No. 29-2009, the Governor of Puerto Rico will decide (in consultation with the Government Development Bank for Puerto Rico ("GDB") and the Office of Management and Budget ("OMB")) how to allocate the proceeds of the Concession Extension.  *See* 27 L.P.R.A. § 2616.  And while those proceeds could be permissibly allocated to PRHTA, Section 17 expressly permits the Governor to direct the proceeds of a privatization

-2-

transaction like this one to a host of purposes of the Commonwealth and to recipients *other than* PRHTA—including to pay down Commonwealth or GDB debt.  *See id.*; *see also Puerto Rico Mulls Use of $115 Million Raised in Highway Deal as Defaults Loom*, REORG RESEARCH, Apr. 22, 2016 (speculating, prior to the declaration of moratorium with respect to the portion of the $422 million debt payment GDB was bound to make on May 1, 2016, that the Governor might use the sale proceeds to fund such debt payment by GDB).

3.      Public information about the Concession Extension is limited.  The transaction has reportedly closed, but the status of the proceeds has not been disclosed.  On Friday, April 29, 2016, counsel to Plaintiff delivered a letter to PRHTA's counsel requesting confirmation that the Authority was maintaining, and would continue to maintain, the proceeds of the transaction for the benefit of PRHTA and its bondholders.  The following Monday, May 2, 2016, counsel to PRHTA stated in response that the funds were "currently being held by the Economic Development Bank for Puerto Rico ['EDB'] in the name of the Authority."  The letter ignored Plaintiff's request for confirmation that the Authority would continue to maintain the proceeds for the benefit of PRHTA and its bondholders, providing no assurance that the funds would remain in the EDB account or otherwise be protected from transfer.

4.      PRHTA's lack of transparency with respect to this transaction is consistent with its ongoing refusal—for well over a year—to comply with its contractual obligations to provide basic financial information to bondholders and Plaintiff, or to provide trust balances and an accounting of how much revenue has been "clawed back" from PRHTA pursuant to the Governor's executive orders.  Plaintiff, as insurer of over $472 million (net of reinsurance) of PRHTA bonds currently outstanding, has significant information rights with respect to PRHTA arising from agreements regarding bond insurance entered into between PRHTA and the fiscal

agent for the PRHTA bondholders (the "Ambac Insurance Agreements") and/or the PRHTA resolutions authorizing the issuance of such bonds.  Plaintiff has made repeated requests for information from PRHTA but has received little or no information in response.  Publicly available information suggests that PRHTA can make its next bond payments (due July 1, 2016) only by dipping into a special "reserve fund" that the Authority would not need to utilize if it were financially sound (though this has proven impossible to confirm due to PRHTA's intransigence in responding to information requests).  Whether PRHTA will be able to make subsequent bond payments is very much in question.  If it does not, then Plaintiff, as an insurer of PRHTA bonds, will be required to do so for the bonds it has insured.

5.     The decision to enter into the Concession Extension at this time is the latest instance of questionable behavior by PRHTA.  The Authority's treasurer was indicted in 2014, pleaded guilty to federal bribery charges in October 2015 and was sentenced to a year in prison. PRHTA delayed half a year in releasing its audited 2014 financial statements and, when finally released, those financial statements disclosed that the Authority's independent auditors had included a "going concern" qualification in their audit opinion and had identified *five* material weaknesses in PRHTA's internal controls over financial reporting.   PRHTA has already defaulted on over $500 million in debt owed to GDB.  And, as noted, PRHTA has repeatedly breached its contractual and statutorily mandated obligations to provide Plaintiff and other PRHTA stakeholders information concerning PRHTA's financial condition.  Because of these failures, Plaintiff has not been able to assess PRHTA's true financial condition, and the extent to which PRHTA has complied with its legal obligations as set forth in various bond resolutions governing the issuance of PRHTA bonds.

6.      The crisis at PRHTA has reached a breaking point.  PRHTA and its directors and officers have proven themselves unwilling or unable to fulfill their fiduciary and contractual duties to PRHTA's bondholders.  Coupled with the suspect timing of its decision to enter into the Concession Extension, PRHTA's failure to make proper disclosure and its continuing refusal to comply with its legal obligations to allow inspection of its books and records underscore the need for immediate relief from this Court in the form of (1) expedited discovery so that Plaintiff can ascertain the full extent of PRHTA's malfeasance; and (2) the appointment of a provisional receiver over PRHTA to avoid further irreparable harm to PRHTA, its bondholders, and Plaintiff.

## THE PARTIES

7.      Plaintiff Ambac is a Wisconsin-domiciled stock insurance corporation with its principal place of business at One State Street Plaza, New York, New York 10004.

8.      Plaintiff is a monoline insurer that provides financial guarantees to the United States and global public finance, infrastructure, and structured finance markets.

9.      Plaintiff brings this action to protect its rights under the laws and documents under which certain PRHTA bonds were issued and insured, as described below.

10.     Defendant PRHTA is a public corporation of the Commonwealth of Puerto Rico, with full legal capacity to sue and be sued pursuant to 9 L.P.R.A. § 2004(g), and maintains its principal executive offices at Centro Gubernamental Minillas, South Tower, 17th Floor, in San Juan, Puerto Rico.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.

12. PRHTA is not entitled to sovereign immunity from suit. *See, e.g.*, *Redondo Constr. Corp. v. Puerto Rico Highway and Transp. Auth.*, 357 F.3d 124 (1st Cir. 2004).

13. This complaint presents an actual controversy that is ripe for adjudication. As described below, PRHTA is in severe financial distress. PRHTA is currently subject to "clawback" of its funds and has already defaulted on over $500 million in debt to GDB. As such, PRHTA faces a significant likelihood of default on future bond payments. Notwithstanding these facts, PRHTA entered into a transaction monetizing PRHTA assets, the proceeds of which will likely be used for purposes unrelated—and providing no benefit—to PRHTA, or to repay subordinated debt held by GDB, or otherwise for purposes that will negatively impact PRHTA's senior bondholders and Plaintiff, in violation of PRHTA's fiduciary and contractual duties. Plaintiff is required to make payment on claims of holders of insured PRHTA bonds pursuant to its bond insurance policies in the event PRHTA defaults on its payments to such holders. Plaintiff seeks appointment of a provisional receiver to prevent further, irreparable harm to it.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant is a resident of this District.

**I.      Plaintiff Insures Bonds Issued by PRHTA**

     **A.      Financial Guaranty Insurance**

15. Plaintiff is a leading provider of financial guaranty insurance, by which an insurer guarantees scheduled payments of principal and interest as and when due on a bond or other obligation. Plaintiff insures scheduled principal and interest payments on municipal, public infrastructure, and structured financings in the United States and around the world. Under relevant provisions of the bond documents and bond insurance policies, and applicable law,

payment by providers of financial guaranty insurance neither satisfies nor discharges an issuer's obligation to pay. To the extent insurers make such payments, they become owners of the subject bonds and/or become subrogated to the rights of the bondholders, effectively stepping into their shoes.

16. One reason governments and municipalities, including PRHTA, have historically taken advantage of financial guaranty insurance is that the insurance of their principal and interest payment obligations may have the effect of significantly enhancing their ability to raise funds. Financial guaranty insurance is especially important for an issuer such as PRHTA which has—and will have—significant borrowing needs, notwithstanding its weak credit rating. Plaintiff's insurance has permitted PRHTA to issue over $3 billion in bonds in a more cost-effective manner, which, in turn, has permitted PRHTA, the Commonwealth, and other Commonwealth instrumentalities to implement important infrastructure projects across Puerto Rico. Among other projects, the proceeds of PRHTA bonds have been used to finance the construction of and necessary repairs to numerous toll highways and connecting roads, including PR-5, PR-20, PR-22, PR-52, and PR-53, and the construction, operation, and maintenance of Tren Urbano, a rapid transit system serving the San Juan metropolitan area.

   **B.**   **PRHTA**

17. PRHTA is a public corporation created by Act No. 74-1965 (the "PRHTA Enabling Act") to assume responsibility for the construction of highways and other transportation systems in Puerto Rico. *See* 9 L.P.R.A. § 2002. Under the PRHTA Enabling Act, PRHTA has the power to "sue and be sued," to "make contracts and to execute all instruments necessary or incidental in the exercise of any of its powers," and to issue bonds. 9 L.P.R.A. § 2004(g), (h), (*l*). Pursuant to the PRHTA Enabling Act, PRHTA issued the PRHTA bonds

under resolutions executed in 1968 (the "1968 Resolution") and 1998 (the "1998 Resolution" and, together with the 1968 Resolution, the "PRHTA Resolutions").  The PRHTA bonds have an outstanding principal amount of $4.6 billion.

18.     PRHTA's Board of Directors is hopelessly conflicted.  For example, Melba Acosta-Febo is the President of GDB and a member of the Board of Directors of PRHTA.  Juan Zaragoza Gómez is the Secretary of the Treasury of the Commonwealth and a member of the Board of Directors of PRHTA.  Luis García Pelatti is President of the Planning Board of the Commonwealth and a member of the Board of Directors of PRHTA.

19.     Pursuant to the PRHTA Enabling Act and the PRHTA Resolutions, the PRHTA bonds are secured by PRHTA's property and revenues, as well as by any tax "made available to [PRHTA] by the Commonwealth," authorized by the Commonwealth to be pledged to the payment of the principal and interest of bonds, and pledged by PRHTA to such payments.  *See* 9 L.P.R.A. § 2004(*l*).  More specifically, the PRHTA bonds are secured by a lien on (i) revenues derived from PRHTA's toll facilities ("Tolls"); (ii) gasoline, diesel, crude oil, and other excise taxes levied by the Commonwealth (the "Excise Taxes"); and (iii) motor vehicle license fees (the "Vehicle Fees", and together with the Tolls and Excise Taxes, the "PRHTA Pledged Revenues").  PRHTA's rights and powers under the PRHTA Enabling Act include the right and the power to secure the PRHTA bonds through a pledge of the PRHTA Pledged Revenues.  *See* 9 L.P.R.A. § 2004(*l*); *see also id.* § 2012(e)(1), (h).

20.     Plaintiff has insured over $472 million (net of reinsurance) of PRHTA bonds currently outstanding.   Under the Ambac Insurance Agreements, Plaintiff is a third-party beneficiary of many of the PRHTA bonds it insures and may enforce all rights, remedies, and claims with respect to such Bonds.  *See*, *e.g.*, Series AA Ambac Insurance Agreement § 10;

-8-

Series H Ambac Insurance Agreement § 10; Series BB/L Ambac Insurance Agreement § 7.  In addition, Plaintiff will become the owner of any bonds for which it pays a claim in respect of a default on principal, and, upon the making of any payment in respect of the bonds, will be assigned, and become subrogated to, the rights of the holders of such bonds.  Series AA Ambac Agreement Regarding Bond Insurance § 10; Series H PRHTA Agreement Regarding Bond Insurance § 10.

II.     **PRHTA Owes Fiduciary and Contractual Duties to its Creditors Including Plaintiff**

21.     Under the PRHTA Enabling Act, PRHTA is required "to account as if it were the trustee of an express trust."  9 L.P.R.A. § 2013(a)(2).  The duties and responsibilities of trustees are broadly defined by statute.  *See, e.g.*, 31 L.P.R.A. §§ 2569, 2573, 2574.[1]

22.     As part of its obligations to account as if it were the trustee of an express trust, PRHTA is required to adopt a high standard of loyalty and good faith, and owes fiduciary duties to its bondholders.

23.     Furthermore, the 1998 Resolution provides that "no contract or contracts will be entered into or any action taken by which the rights of . . . the bondholders might be impaired or diminished."   1998 Resolution § 611.  Therefore, under the 1998 Resolution, PRHTA is contractually obligated not to enter into any contract that would impair or diminish PRHTA bondholders' rights.

24.     As noted above, under various insurance agreements applicable to PRHTA bonds, Plaintiff is a third-party beneficiary of PRHTA's contractual obligations concerning such bonds and is entitled to enforce all rights, remedies, and claims available to PRHTA bondholders,

_____

[1]  The duties of trustees for trusts constituted on or after August 31, 2012 are defined by Act No. 219-2012 (codified at 32 L.P.R.A. §§ 3352-3353aa).

-9-

including the right to commence litigation.  *See supra* ¶ 20.  Therefore, Plaintiff has standing to bring the claims asserted herein.

### III.   Worsening Financial Condition of the Commonwealth, PRHTA and GDB

#### A.   The Commonwealth's Fiscal State

25.   On June 28, 2015, Puerto Rico Governor Alejandro García Padilla publicly stated that the Commonwealth was in a "death spiral" and acknowledged that it and its municipalities could not pay their roughly $72 billion in debts.  Michael Corkery and Mary Williams Walsh, *Puerto Rico's Governor Says Island's Debts are 'Not Payable'*, N.Y. TIMES, June 28, 2015, at A1.[2]   Officers and representatives of the Commonwealth have repeatedly stated that the Commonwealth is in a state of fiscal emergency.

#### B.   "Clawback" of Funds

26.   In response to the reported fiscal emergency, the Governor has issued multiple executive orders directing the Puerto Rico Department of the Treasury to divert certain funds pledged for repayment of the bonds of various municipalities away from their intended use and to the Commonwealth's general fund, reportedly for application to payments on public debt. These executive orders are made under color of certain provisions in the Constitution of the Commonwealth of Puerto Rico which provide that if, in a given fiscal year, revenues are insufficient to make payments on "public debt" (debt guaranteed by the faith and credit of the Commonwealth), interest and principal payments due on the public debt must be made before any other disbursements.[3]

---

[2] *Available at* http://www.nytimes.com/2015/06/29/business/dealbook/puerto-ricos-governor-says-islandsdebts-are-not-payable.html?_r=0.

[3] Plaintiff has challenged the constitutionality of these executive orders in a related case pending before this Court. *See Assured Guaranty v. García Padilla*, No. 16-cv-1037 (D.P.R.).

27.     The Governor issued Administrative Bulletin No. OE-2015-046 (the "First Executive Order") on November 30, 2015, which implemented the "clawback" of funds from certain public corporations.  The First Executive Order declares that there are insufficient funds to pay all appropriations in fiscal year 2016, and directs the Secretary of the Treasury to (*inter alia*) withhold funds from PRHTA intended for application to the PRHTA bonds.

28.     On information and belief, the Secretary of the Treasury has diverted revenues from PRHTA pursuant to the First Executive Order.

29.     The "clawback" of revenues substantially undermines PRHTA's ability to fund its operations, as it is obligated to do under the 1998 Resolution.  For example, under Section 604 of the 1998 Resolution, PRHTA covenants "that it will operate or cause to be operated the Toll Facilities, any Mass Transit Facilities and all other Transportation Facilities that it may from time to time operate or cause to be operated in an efficient and economical manner, that it will at all times maintain or cause to be maintained such Transportation Facilities in good repair and in sound operating condition and that it will make or cause to be made all necessary repairs, renewals and replacements thereto to restore such Facilities to such repair and condition." Collectively, Toll Facilities, Mass Transit Facilities and Transportation Facilities encompass all the facilities built by bond proceeds, and the property used in connection with the operation of mass transportation systems, whether or not financed by bond proceeds or directly operated by the Authority.

30.     Accordingly, the "clawback" eliminates a key source of operational funding for PRHTA and exacerbates PRHTA's operating losses.  PRHTA was created—and statutorily mandated—to improve the Commonwealth's lagging transportation infrastructure, in part, because that infrastructure is essential to the people and "the economic growth of Puerto Rico."

9 L.P.R.A. § 2002.  It was therefore irresponsible for PRHTA to sell assets that could have been used to meet its operational requirements when it knew that it would have no control over the proceeds of the sale, and the loss of those proceeds would render it unable to fulfill its critical statutory mandates.

### C.     PRHTA's Financial Distress

31.     Even before the "clawback" was implemented, PRHTA was in severe financial distress.

32.     When opining on PRHTA's Audited Financial Statements for the years ended June 30, 2013 and June 30, 2014 ("PRHTA 2013/14 Audit"), PRHTA's independent auditor, Ernst & Young, LLP ("E&Y"), expressed "substantial doubt about [PRHTA's] ability to continue as a going concern."  PRHTA 2013/14 Audit at 2.[4]  E&Y further stated that "[t]he Authority has significant recurring losses from operations and does not have sufficient funds available to fully repay its various obligations as they come due."  *Id*. at 2; *see also id.* at 85.

33.     As the Commonwealth and GDB are also under severe financial strain,[5] the Commonwealth and GDB cannot be expected to aid PRHTA in repaying its debts, funding its operations, or complying with its bond covenants, as they have in the past.  Accordingly, PRHTA has admitted that "future defaults on the Authority's obligations may not be avoided." PRHTA 2013/14 Audit at 85.

34.     PRHTA is currently subject to "clawback" of its funds and has already defaulted on over $500 million in debt to GDB.  As such, PRHTA faces a significant likelihood of default

---

[4] *Available at* http://www.gdb-pur.com/investors_resources/ documents/PRHTA-AFS-FY2014.pdf.

[5] *See Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gomez*, No. 15-3018 (Dkt. No. 141), at 1 (D.P.R. Mar. 28, 2015) (describing the financial distress of the Commonwealth and GDB); PRHTA 2013/14 Audit at 85 (the Commonwealth and GDB "are experiencing significant financial difficulties and may be unable to continue to . . . provide the necessary liquidity to the Authority as and when needed").

on future bond payments.  *See* PRHTA 2013/14 Audit at 23 ("[T]he Authority does not currently have sufficient funds available to fully repay its various obligations as they come due . . . . [F]uture defaults on the Authority's obligations may not be avoided.").

35.     Because PRHTA has breached its contractual obligations to provide Plaintiff with certain financial information (*see infra* ¶¶ 65-84), Plaintiff does not have a complete picture of PRHTA's true financial condition.  However, PRHTA has bond payments of $233 million due on July 1, 2016.  Publicly available information suggests that PRHTA can make those payments only by drawing on a "reserve fund" that the Authority would not need to utilize if it were financially healthy, though it is not clear whether sufficient monies remain in such reserve fund. Whether PRHTA can make bond payments due after July 1 is an open question.   If PRHTA fails to make those payments, Plaintiff will be forced to make payments to its insureds on account of any claimed deficiency.

### D.       GDB's Financial Distress

36.     GDB is also in severe financial distress.  As noted in a recent decision by Judge Fusté, the Commissioner of Financial Institutions recently found GDB to be insolvent (though the Court declined to directly adopt this finding).   *Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gomez*, No. 15-3018 (Dkt. No. 141), at 17 (D.P.R.).

37.     GDB recently faced a $422.8 million debt payment due on May 1, 2016.  Puerto Rico Treasury Secretary Juan Zaragoza, also a director of GDB, had already stated that GDB did not have sufficient liquidity to make this payment.  *Puerto Rico Treasury Chief: GDB Under 'Constant Evaluation,'* REORG RESEARCH, March 29, 2016.

38.     On the evening of May 1, 2016, the Governor signed an executive order declaring a moratorium on GDB's $422.8 million May 1 debt payment.  *See* Administrative Bulletin No.

OE-2016-014 (Apr. 30, 2016); *Puerto Rico Governor Declares Moratorium on $422.8 Million GDB Payment*, REORG RESEARCH, May 1, 2016.  In declaring this moratorium, the Governor acted under color of the recently enacted Act No. 21-2016 of April 6, 2016, known as the Puerto Rico Emergency Moratorium and Fiscal Rehabilitation Act (the "Moratorium Act"), which permits the Governor to declare an emergency moratorium on debt payments via executive order.

39.     Just after midnight on May 2, 2016, GDB announced that it had reached a "framework" restructuring agreement with an ad hoc group of noteholders (the "Ad Hoc GDB Noteholders") holding approximately $900 million of approximately $4 billion in GDB debt, subject to participation by 100% of GDB noteholders.  *GDB Ad Hoc Group Agrees to Framework Deal of 53% Haircut on Old Notes*, REORG RESEARCH, May 2, 2016.  Certain of the Ad Hoc GDB Noteholders reportedly entered into a 30-day forbearance agreement on GDB's May 1 payment.  *Id.*

40.     Later in the afternoon of May 2, 2016, the Governor announced that GDB would default on $367 million of the $422.8 million May 1 debt payment.

### E.     GDB's Loans to PRHTA

41.     According to PRHTA's most recent audited financial statements, as of June 30, 2014, GDB had extended over $1.8 billion in credit to PRHTA.  *See* PRHTA 2013/14 Audit at 64-68.  Reports released by GDB indicate that, as of September 30, 2014, PRHTA owed GDB approximately $2 billion.  *See* Government Development Bank for Puerto Rico, *Special Liquidity Update*, October 17, 2014, at 5.

42.     Pursuant to Sections 602 of the PRHTA Resolutions, PRHTA is prohibited from securing any indebtedness with a lien on the PRHTA Pledged Revenues that is senior to or on parity with the lien on the PRHTA Pledged Revenues securing the bond debt, other than in

certain limited circumstances.  The GDB loan must be treated as subordinate to the bond debt. The subordinate nature of this loan is recognized by others in the marketplace.[6]  As described herein (*see infra* ¶¶ 44-53), by electing to enter into the Concession Extension at this time, PRHTA has wrongfully enabled the potential diversion of PRHTA assets to the benefit of the Commonwealth or GDB (whose President also serves on PRHTA's Board of Directors), potentially allowing its junior debt to be prioritized over its senior debt—to the detriment of its senior creditors, including Plaintiff—and injuring its ability to comply with its operational covenants under the 1998 Resolution and to fulfill its mandate as set forth in PRHTA's Enabling Act.  In addition to being irresponsible and a breach of PRHTA's duties to its bondholders and Plaintiff, such actions constitute a breach of Section 611 of the 1998 Resolution, which, as noted, prohibits PRHTA from entering into any contract or taking any action "by which the rights of . . . the bondholders might be impaired or diminished."  1998 Resolution § 611.

43.    As of June 30, 2014 (the date of PRHTA's most recently available audited financial statement), PRHTA had defaulted on approximately $590 million owed to GDB.  *See* PRHTA 2013/14 Audit at 16.

**IV.    The Concession Agreement and Extension**

**A.    The Puerto Rico Public-Private Partnerships Authority**

44.    In 2009, the Puerto Rico Legislative Assembly (the "Legislative Assembly") passed Act No. 29-2009, the Public-Private Partnership Act ("Act 29") (codified at 27 L.P.R.A. §§ 2601-2623), with the mission of "promot[ing] the use of Public-Private Partnerships as a development strategy."  Act 29, Statement of Motives.  Act 29 creates the Puerto Rico Public-

---

[6] *See, e.g.*, *Puerto Rico General Obligation Debt Rating Lowered to 'B' from 'BB' on Potential Inability to Meet Debt Commitments*, STANDARD & POOR'S, Feb. 12, 2015 (*available at* http://www.gdbpr.com/investors_resources /documents/SPPRGOdebtratingFeb122015-PR.pdf (identifying GDB's loan to PRHTA as "an unrated subordinate HTA loan")).

Private Partnerships Authority (the "PPPA"), which has the authority to, among other things, evaluate and select government entities, functions, services, and facilities for partnerships; create and approve regulations regulating procedures establishing partnerships; negotiate and evaluate the terms and conditions of partnership contracts; and supervise partnerships.  27 L.P.R.A. § 2605(b).

45.     GDB President and PRHTA Board member Melba Acosta Febo is a member of the PPPA's Board of Directors.

**B.     The 2011 Concession Agreement**

46.     On June 27, 2011, PRHTA entered into a forty-year concession agreement (the "Concession Agreement") with Metropistas.

47.     The Concession Agreement granted a 40-year lease and assigned certain toll revenues generated by the use of PR-22 and PR-5 to Metropistas in exchange for, in relevant part, an up-front concession fee of approximately $1.1 billion (the "Concession Fee").  These toll revenues were previously pledged to the repayment of the PRHTA bonds.  In connection with the Concession Agreement, PRHTA represented that a portion of the Concession Fee (approximately $850 million) was used to defease the PRHTA bonds to which these toll revenues were pledged.  If the $850 million was in fact so used, it would have the effect of releasing the liens on the applicable PRHTA bonds.

48.     In addition to the assignment of certain toll revenues to Metropistas, the Concession Agreement also provided for a 50-50 split of other toll revenues (those generated through a specific dynamic-pricing system) between PRHTA and Metropistas.

C.    **The 2016 Concession Extension**

49.    On or about April 21, 2016, PRHTA and Metropistas entered into the Concession Extension, agreeing to extend the Concession Agreement for 10 more years, to 2061.[7]  As part of the Concession Extension, PRHTA agreed to reduce, from 50% to 25%, the amount it receives from the dynamic-pricing toll system installed on PR-22 (the "Toll Share Reduction").

50.    The Concession Extension provides for PRHTA to receive an additional $100 million upfront payment (the "Initial Extension Payment"), with the possibility of an additional $15 million (the "Delayed Extension Payment" and, together with the Initial Extension Payment, the "Extension Payments") upon the satisfaction of certain conditions.[8]

51.    The Concession Extension is a P3A transaction.  Therefore, under Section 17 of Act 29, the Governor of Puerto Rico will decide, based on recommendations from GDB and OMB, how to allocate the proceeds of the transaction.  *See* 27 L.P.R.A. § 2616.  Under Section 17, the proceeds need not be used for the benefit of PRHTA.  Instead, Section 17 expressly permits the Governor to direct the proceeds of a P3A transaction to a variety of other uses, including to "pay debts of any kind, even operational debts, of the Commonwealth of Puerto Rico." *Id.*

52.    On information and belief, the Extension Payments will be used to repay PRHTA's loan to GDB or for other Commonwealth purposes to the detriment of PRHTA's bondholders.  The day after the Concession Extension was announced, PRHTA's Executive Director, Carmen Villar Prados, publicly acknowledged that the Extension Payments could be used to pay down PRHTA's debt to GDB, stating that the Authority had "yet to determine how

---

[7] By extending the overall term of the Concession Agreement to 50 years, PRHTA achieved the maximum term permissible under Act 29 without triggering a legislative approval requirement.  *See* 27 L.P.R.A. § 2609(e) (providing that any extension of P3A beyond 50 years "must be approved by legislation").

[8] As part of the Concession Agreement, Metropistas also agreed to make investments in new tolling gantries and to share with PRHTA 30% of certain incremental revenues on such new gantries.

to use the money." *Puerto Rico Mulls Use of $115 Million Raised in Highway Deal as Defaults Loom*, REORG RESEARCH, Apr. 22, 2016.   In so stating, PRHTA's Executive Director misleadingly intimated that disposition of the Extension Payments was controlled by PRHTA, and not by the Governor.

53.     After learning of the Concession Extension and becoming concerned about the potential diversion of its proceeds, on April 29, 2016, Plaintiff sent a letter to PRHTA's counsel, Nixon Peabody ("Nixon") requesting confirmation by 12:00 p.m. on May 2, 2016, that PRHTA had maintained, and would continue to maintain, the proceeds of the Concession Extension for the benefit of PRHTA and its bondholders.   In response, at 2:17 p.m. on May 2, 2016, Nixon stated that the proceeds of the Concession Extension were being held by EDB "in the name of the Authority," but declined to offer any assurance those proceeds would be held for the benefit of PRHTA and its bondholders.

## V.     PRHTA's History of Financial Mismanagement

54.     PRHTA has a long history of financial mismanagement and alleged corruption that demonstrates the need to appoint a provisional receiver over PRHTA.

### A.     PRHTA Treasurer Pleads Guilty to Federal Bribery Charges

55.     In December 2014, Silvino Cepeda-Ortiz, the PRHTA Treasurer, was arrested in connection with bribery charges.   *PRHTA Treasurer Arrested by FBI*, REORG RESEARCH, Dec. 3, 2014.   The charges stemmed from "kickback" payments Cepeda-Ortiz solicited and received from contractors hired to perform work on projects funded by federal programs.   *Id.*   Cepeda-Ortiz pleaded guilty in October 2015 and, in February 2016, was sentenced to one year in prison. *Un año en prisión al extesorero de la Autoridad de Carreteras*, PRIMERA HORA, Feb. 22, 2016.

-18-

**B.**    **PRHTA's Auditors Express Concern Over Financial Mismanagement**

56.    PRHTA's independent auditors have expressed significant concerns about financial mismanagement within PRHTA.  In addition to the inclusion of a going concern qualification, the PRHTA 2013/14 Audit identified "significant recurring losses" from operations, and "business challenges exacerbated by the Commonwealth's economic recession and the fact that *the Authority has not increased tolls to its customers at sufficient levels to offset the effects of its rising costs*."  *See* PRHTA 2013/14 Audit at 83 (emphasis added).  Of the $177.8 million loss posted for FY 2014, $105.1 million was due to mass transit losses.  *Id*. at 90.

57.    PRHTA has also repeatedly failed to make payments due to the Puerto Rico Electric Power Authority.  *See id*. at 79.

58.    The 2013/14 Audit lists five control failures that amount to "material weaknesses" in PRHTA's operational procedures:

      i.    PRHTA manually processes a significant volume of transactions related to its construction in progress operation, resulting in an inaccurate financial picture and impairment of management decision-making.

      ii.    PRHTA's financial statement closing process was not performed in a timely manner, resulting in inefficient use of finance group resources and impairment of management decision-making.

      iii.    PRHTA exhibits control deficiencies in its internal controls over monitoring of tolls revenues, resulting in an inaccurate financial picture and impairment of management decision-making.

      iv.    Failure to accrue federal expenditures and compile the Schedule of Federal Expenditures Awards (SEFA) in a timely manner, potentially causing material omissions of certain grant expenditures and delays in the audit process.

> v.      PRHTA's lack of control over the accounts payable reconciliation process led to material adjustments in its financial statements.

*See id.* at 91-97.[9]

### C.      PRHTA's Delay in Releasing Required Financial Disclosures

59.      PRHTA has annual disclosure obligations under the PRHTA Resolutions and related agreements, including agreements concerning continuing disclosure (the "PRHTA Continuing Disclosure Agreements") and the authorizing resolutions of each series of PRHTA bonds (the "PRHTA Authorizing Resolutions").  Pursuant to the Continuing Disclosure Agreements and the Authorizing Resolutions, PRHTA is required to disclose its audited financial statements within 305 days after the end of each fiscal year.  *See, e.g.*, Series AA/H PRHTA Continuing Disclosure Agreement § 3(b); Series AA PRHTA Authorizing Resolution § 14(a)(A); Series H PRHTA Authorizing Resolution § 14(a)(A).  Audited financial statements for the fiscal year ending June 30, 2014, due no later than May 1, 2015, were not released until December 23, 2015—over seven months past due.

60.      Upon information and belief, PRHTA's delay in releasing its 2014 financial statements likely contributed to the significant delay in the release of the Commonwealth's 2014 Comprehensive Annual Financial Report ("2014 CAFR").  The 2014 CAFR, due for release on May 31, 2015 and nearly eleven months overdue, has not yet been released.

61.      The delay in the 2014 CAFR release has held up many refinancing efforts, including a proposed deal between PRHTA and the Puerto Rico Infrastructure Financing Authority ("PRIFA"), which was designed to provide PRHTA with liquidity and enable PRHTA to become self-sufficient.  This proposed deal with PRIFA ultimately fell through.

---

[9] The audit also found that PRHTA's lack of appropriate procedures to ensure a complete financial reporting package may cause delays in the single audit issuance process thus affecting low-risk auditee status and future grant awards.  *Id.* at 97.

D.    **PRHTA's Failure to Take Advantage of Federal Assistance**

62.    Not only has PRHTA failed to properly use its own resources, PRHTA has also failed to take advantage of federal assistance to which it is entitled.

63.    PRHTA's 2014 audit reveals that in March 2014, the Federal Highway Transportation Authority "approved $756.4 million in toll credits that may be applied toward the non-Federal matching share of transit projects. *These tolls credits will remain available* until used." *See* PRHTA 2013/14 Audit at 82, 84 (emphasis added).

64.    On information and belief, PRHTA has not taken advantage of the $750 million in federal toll credits.

VI.    **PRHTA's Failure to Provide Contractually Required Information**

65.    PRHTA has violated its contractual and fiduciary obligations through a prolonged campaign of obfuscation and refusal to provide Plaintiff and other senior creditors with basic financial information.

66.    This deliberate denial of access to information is both unlawful and plainly designed to further the Commonwealth and its affiliated entities' efforts to strip the distressed PRHTA of its remaining assets in violation of its duties to PRHTA's bondholders.

A.    **PRHTA is Obligated to Open Its Records to All Interested Persons**

67.    The PRHTA Resolutions provide inspection rights to "all interested persons." Specifically, Section 607 of the PRHTA Resolutions states that "[t]he Authority covenants that it will keep accurate records and accounts of all items of cost and of all expenditures relating to the Transportation Facilities and of the Revenues and the application of moneys held to the credit of the Revenue Fund.  Such records and accounts shall be open to the inspection of all interested persons."

-21-

68.     In addition, Section 1004 of the 1968 Resolution and Section 1103 of the 1998 Resolution provide that all documents received by the Fiscal Agent (*i.e.*, the bank or trust company appointed by PRHTA in connection with the PRHTA Resolutions) shall be "subject at all reasonable times to the inspection of the Authority, any bondholder and the agents and representatives thereof."

69.     Pursuant to its insurance agreements with PRHTA, Plaintiff stands in the shoes of PRTHA bondholders as a third-party beneficiary of PRHTA's contractual obligations under the PHRTA Resolutions.  *See supra* ¶ 20.  Therefore, Plaintiff has and is entitled to exercise inspection rights under the PRHTA Resolutions on the same terms as PRHTA bondholders.

70.     Furthermore, as an insurer of certain series of PRHTA bonds, Plaintiff has specific information rights with respect to PRHTA.  For example, under the Ambac Insurance Agreements, the Authority is required "to furnish to Ambac, upon request," copies of financial statements, copies of materials produced in accordance with PRHTA's continuing disclosure requirements, and "such additional information [Ambac] may reasonably request."  *See, e.g.*, Series AA Ambac Insurance Agreement § 4(4); Series H Ambac Insurance Agreement § 4(4).

## B.     <u>PRHTA Has Repeatedly Failed to Provide Requested Information</u>

71.     PRHTA has failed to provide information about its books and records to Plaintiff and other monoline insurers, despite repeated requests, thus breaching the inspection rights covenant under the PRHTA Resolutions and its fiduciary duties to the PRHTA bondholders.

72.     On October 7, 2014, Plaintiff, National Public Finance Guarantee Corporation ("<u>National</u>"), and Assured Guaranty Corporation and Assured Guaranty Municipal Corporation (together, "<u>Assured</u>") sent PRHTA a letter requesting financial information including, but not

limited to, a five-year business plan, recent historical monthly financials and balance sheets, and details of all reserve accounts.

73.     On October 9, 2014, National sent a letter to PRHTA's Fiscal Agent, Bank of New York ("BONY").  The letter reminded BONY of PRHTA's obligation pursuant to the bond obligations to conduct an audit of its books and accounts relating to Traffic Facilities and the Transportation Facilities financed by the bonds, and requested that BONY send such information to National's counsel.  BONY responded on October 23, 2014 and instructed National to contact PRHTA directly for the information because, as Fiscal Agent, it was not in a position to comply with National's request.

74.     On April 6, 2015, Plaintiff sent a letter to various representatives of PRHTA, including PRHTA Board Member and GDB President Melba Acosta Febo, requesting information about PRHTA's accounts and deposits.

75.     Following a three-month period in which PRHTA produced only one of the requested items, Plaintiff sent another letter on July 9, 2015 to the same PRHTA representatives reiterating its previous information requests.

76.     On March 2, 2016, Plaintiff wrote to the same PRHTA representatives in connection with its attempts to obtain financial information from BONY.  The letter stated that, prior to March 2, Plaintiff had made multiple requests for similar information from the Fiscal Agent in emails and phone calls to BONY's outside attorney, Reed Smith LLP ("Reed Smith").  In a March 11, 2016 letter, BONY responded that it would not release such information without PRHTA's consent and directed Plaintiff to seek the information directly from PRHTA.  To date, PRHTA has failed to provide either the requisite consent or the information.

77.     On March 15, 2016, Plaintiff, National, Assured, Syncora Capital Assurance, Inc. ("Syncora"), and Financial Guaranty Insurance Company ("FGIC," together with National, Assured, Ambac, and Syncora, the "Insurers") elected to exercise their rights to inspection pursuant to Section 607 of the PRHTA Resolutions.  In a letter to PRHTA's counsel, Nixon Peabody ("Nixon"), the Insurers requested financial information about PRHTA for the time period from July 1, 2014 to the date of the letter, including but not limited to, "monthly statements showing all activity in accounts holding Revenues pledged to the Bonds," direction regarding investment and transfer of said funds, and financial records indicating the source of all Revenues.  The Insurers asked that the requested information be produced or made available for inspection within ten days.

78.     On March 22, 2016, PRHTA's counsel, Nixon, responded to the Insurers' March 15 letter.  Nixon's letter was noncommittal and promised only that once it completed its "review of the request and the Authority's obligations pursuant to the PRHTA Resolutions and the bond insurance agreements," they would "make available to [the Insurers] any appropriate information."

79.     On March 23, 2016, National, Assured, Syncora, and FGIC elected to exercise their rights pursuant to Section 1004 of the 1968 Resolution and Section 1103 of the 1998 Resolution to inspect certain documents in the possession of PRHTA's Fiscal Agent, BONY. The letter was addressed to BONY's counsel, Reed Smith, and requested that BONY produce information about the balances, deposits, and investments made with PRHTA's funds within ten days.

80.     In response to Nixon's March 22 letter, the Insurers reiterated their request for information in a March 25, 2016 letter.  Counsel for the Insurers stated that Nixon's March 22

letter had "fail[ed] to identify what requested information (if any) [would] be made available, nor [did] it specify a date for production or inspection of such documents."  In addition, counsel for the Insurers requested that, to the extent that PRHTA refused to provide certain documents, it identify which documents would not be provided and its reason for withholding them.

81.    On March 29, Nixon responded to the Insurers' March 25 letter.  The response attached two documents that had been requested (contracts related to the monies received pursuant to the federal State Infrastructure Bank program), but continued to be vague and noncommittal.   Specifically, the letter stated that PRHTA was still "gathering additional information in order to be able to respond to [the Insurers'] requests," that said information would be "promptly reviewed by counsel," and that said information would then be made available to the Insurers.   Nixon did not specify a timeline for the gathering, review, and production of the requested documents.

82.    On April 6, 2016, National, Assured, Syncora, and FGIC responded to Nixon's March 29 letter, stating that they had "received only a small fraction of the requested documents, accompanied by vague assurances that PRHTA and its Fiscal Agent, BONY, are gathering additional information in order to respond to the Insurers' additional requests."   The letter specifically requested that "PRHTA inform [National, Assured, Syncora, and FGIC] of any PRHTA accounts or monies held at GDB."   Neither PRHTA nor its counsel responded to this letter.

83.    By letter of April 29, 2016, as noted, Plaintiff requested that Nixon confirm that PRHTA had maintained, and would continue to maintain, the proceeds of the Concession Extension for the benefit of PRHTA and its bondholders.  *See supra* ¶ 53.  Plaintiff's April 29 letter further requested a narrow set of documents concerning the Concession Extension and

PRHTA's financial condition by May 4, 2016.  Nixon's May 2, 2016 response—which declined to provide any assurance that the proceeds of the transaction would be used for the benefit of PRHTA and its bondholders—stated that PRHTA was "working with the Authority to collect th[e] materials" requested by Plaintiff, and further stated that "[a]s we have told you previously, once we have gathered and reviewed the information requested, we will provide the responsive information to you and your colleagues."  In so stating, PRHTA referred to its promise to supply documents in its March 22, 2016 letter—a promise that remains entirely unfulfilled.  Based upon PRHTA's prior conduct, it is safe to assume that PRHTA has no intention of timely providing the documents Plaintiff requested on April 29, 2016.  As of the filing of this Complaint, PRHTA has failed to produce the requested documents.

84.     Because of PRHTA's failure to provide contractually required financial information and its failure to disclose information relating to the decision to enter into the Concession Extension, Plaintiff cannot verify whether PRHTA has complied with its contractual and fiduciary obligations to allocate funds in accordance with the PRHTA Resolutions and to otherwise act as a trustee protecting the interests of the bondholders.

## VII.   PRHTA's Actions Have Harmed Plaintiff

85.     Given PRHTA's repeated failure to provide requested information, and PRHTA's long and varied history of financial mismanagement, there is significant risk that the Extension Payments will be used for a purpose other than for the benefit of PRHTA and its bondholders. Indeed, in response to press speculation, the Authority has provided no assurances to the contrary, admitting openly that the Extension Payments could be used to pay down PRHTA's debt to GDB and stating only (and, as noted above, misleadingly) that the Authority had "yet to

determine how to use the money." *Puerto Rico Mulls Use of $115 Million Raised in Highway Deal as Defaults Loom*, REORG RESEARCH, Apr. 22, 2016.

86.     The use of the Extension Payments other than by PRHTA is not in PRHTA's best interests or those of PRHTA's bondholders.  It sacrifices both PRHTA's operational needs and its payment obligations to senior bondholders.

87.     PRHTA's independent auditors question PRHTA's ability to continue as a going concern.  In its most recent audited financial statements, PRHTA admitted that it "does not currently have sufficient funds available to fully repay its various obligations as they come due" and that "future defaults on the Authority's obligations may not be avoided."  PRHTA 2013/2014 Audit at 22.  And PRHTA has already defaulted on over $500 million in debt owed to GDB.  By entering into the Concession Extension under such circumstances, when it knew that it would not control, and almost certainly would not retain, the proceeds from the transaction, and without any indication that the transaction was a corporate opportunity that would be lost if not immediately affected, PRHTA breached its fiduciary duties to Plaintiff and other bondholders.

88.     PRHTA's indifference to the interests of its bondholders—whose position has already significantly deteriorated as a result of the "clawback" of tax revenues dedicated to PRHTA—and its repeated failure to disclose financial information, failure to manage its own resources in the face of operational funding deficits, and fiscal mismanagement threaten to irreparably harm Plaintiff.  PRHTA must be placed into provisional receivership.

## VIII.   A Provisional Receiver Is Needed

89.     PRHTA, as noted, owes fiduciary and contractual duties to Plaintiff and other bondholders, including with respect to the use of revenues received by PRHTA.

90.     PRHTA is facing extraordinary circumstances that require urgent action. PRHTA's inability to pay its current and future debts—combined with the "clawback" of all PRHTA non-toll revenues, the assignment of significant PRHTA toll revenues for the next 45 years, and the Authority's documented pattern of gross mismanagement, have created an exigent need for the appointment of a provisional receiver.

91.     Federal Rule of Civil Procedure 66 provides that "the practice in administering an estate by a receiver or a similar court-appointed officer must accord with the historical practice in federal courts or with a local rule."

92.     The 1998 Resolution specifically contemplates the appointment of a receiver. *See, e.g.*, 1998 Resolution § 902 (outlining order of payment priorities in the event of "bankruptcy, insolvency or receivership").

93.     The appointment of a provisional receiver is justified and necessary because:

(a)     PRHTA has engaged in, and is currently engaging in, breaches of its fiduciary and contractual duties to bondholders.

(b)     PRHTA has engaged in, and is currently engaging in, irresponsible conduct regarding the allocation of PRHTA revenues.

(c)     There is an imminent danger that additional PRHTA revenues will be lost or squandered unless a provisional receiver is appointed.

(d)     Other legal remedies are inadequate because PRHTA's mismanagement has left PRHTA in severe financial distress.   PRHTA requires a neutral and competent manager—one that is not beholden to the competing priorities of GDB and the Commonwealth—to oversee and allocate PRHTA's remaining revenues if PRHTA is to survive as a going concern.

(e)      Appointment of a provisional receiver will not harm PRHTA—to the contrary, provisional receivership is PRHTA's only foreseeable path to financial recovery.  And provisional receivership will not impede PRHTA's ability to perform its essential functions. Moreover, PRHTA's current board of directors is plagued by conflicts of interests due to competing loyalties to GDB and the Commonwealth government.  *See supra* ¶ 18.  Provisional receivership, in contrast, will provide PRHTA with responsible, non-conflicted management— under the ongoing supervision of this Court—that can ensure transparency, the maintenance of public services, and respect for bondholders' rights.

(f)      If a provisional receiver is not appointed, Plaintiff will suffer irreparable injury through PRHTA's permanent loss of substantial revenues, which will further deepen PRHTA's financial distress.   PRHTA's non-toll revenues are being clawed back to pay Commonwealth debts and expenses, and PRHTA's toll revenues are also being diverted away from PRHTA.  The appointment of a provisional receiver will prevent harm not only to Plaintiff, but to all senior PRHTA bondholders, and will prevent PRHTA from giving a windfall to preferred, third-party junior creditors.

94.     Accordingly, Plaintiff is entitled to the appointment of a provisional receiver to oversee the management and distribution of PRHTA revenues.

## FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

95.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 94 hereof, as if fully set forth herein.

96.     Under the PRHTA Enabling Act, 9 L.P.R.A. § 2013(a)(2), PRHTA owes trustee-based fiduciary duties to the PRHTA senior bondholders.   Under Section 611 of the 1998 Resolution, PRHTA owes a duty to refrain from impairing the rights of its bondholders.

97.     The relevant fiduciary duties owed to the PRHTA senior bondholders include:

(a)     The duty to not squander PRHTA assets, and to manage such assets free of conflict, fraud, or negligence;

(b)     The duty to allocate PRHTA revenues to senior bondholders before junior bondholders and/or unsecured junior creditors;

(c)     The duty to not make conflicted, preferential transfers to subordinated, related-party creditors while PRHTA is unable to fulfill its financial obligations to its senior creditors; and

(d)     The duty to apply PRHTA revenues to the PRHTA "waterfall," in accordance with PRHTA's trustee obligations.

98.     PRHTA is currently unable to fulfill all of its financial obligations to its creditors or fully fund its operations.

99.     PRHTA entered into the Concession Extension knowing that it would not have the ability to retain the proceeds of that transaction or to direct their use.

100.    Thus, PRHTA has breached and is currently breaching its fiduciary duties to PRHTA bondholders.   Such breaches cause irreparable harm to Plaintiff.   Appointment of a provisional receiver is necessary to halt PRHTA's ongoing breaches of fiduciary duty and to prevent PRHTA from continuing to breach its fiduciary duties in the future.

## SECOND CLAIM FOR RELIEF

### (Breach of Contract)

101.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 100 hereof, as if fully set forth herein.

102.    The 1998 Resolution is a binding and enforceable contract.

103.    The 1998 Resolution provides that "no contract or contracts will be entered into or any action taken by which the rights of . . . the bondholders might be impaired or diminished." 1998 Resolution § 611.

104.    Plaintiff has at all times fully performed its obligations under the 1998 PRHTA Resolution.

105.    PRHTA is currently unable to fulfill all of its financial obligations to its creditors or fully fund its operations.

106.    PRHTA entered into the Concession Extension knowing that it would not have the ability to retain the proceeds of that transaction or to direct their use.

107.    By entering into the Concession Extension without securing in advance the ability to retain the proceeds of the transaction or direct their use for PRHTA's benefit, PRHTA has breached and is currently breaching its contractual duty to PRHTA bondholders under the 1998 Resolution not to enter into any contract that might impair or diminish the rights of such bondholders.  Such breaches cause irreparable harm to Plaintiff.  Appointment of a provisional receiver is necessary to halt PRHTA's ongoing breaches of its contractual duties and to prevent PRHTA from continuing to breach its contractual duties in the future.

## THIRD CLAIM FOR RELIEF

### (Specific Performance for Breach of Contract)

108.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 107 hereof, as if fully set forth herein.

109.    The PRHTA Resolutions are binding and enforceable contracts.

110.    The PRHTA Resolutions grant Plaintiff the contractual right to inspect PRHTA financial records relating to, *inter alia*, revenues, expenditures, and bond account balances.

111.    The PRHTA Resolutions grant Plaintiff the contractual right to receive audited PRHTA financial reports concerning, for example, PRHTA's revenues, expenditures, and bond account balances.

112.    Plaintiff has at all times fully performed its obligations under the PRHTA Resolutions.

113.    Plaintiff has repeatedly requested PRHTA to allow Plaintiff to inspect PRHTA's financial records and provide Plaintiff with audited financial reports.

114.    PRHTA has steadfastly refused access to PRHTA financial records, and has consistently failed to provide audited PRHTA financial reports.  PRHTA's actions constitute breaches of the PRHTA Resolutions.

115.    PRHTA's breaches of the PRHTA Resolutions are ongoing.  Continued breaches are a virtual certainty.  These breaches cause irreparable harm to Plaintiff.

116.    Plaintiff has no adequate remedy at law that would be equivalent to providing the PRHTA financial information to which they are contractually entitled and that PRHTA wrongfully concealed.

117.    Plaintiff is entitled to specific performance of the PRHTA Resolutions that require Defendant to give Plaintiff access to PRHTA's financial records, and provide Plaintiff

with audited financial reports.  PRHTA's long-running, inexplicable refusal to honor Plaintiff's contractual inspection rights reinforces the need to appoint a provisional receiver.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter an order granting the following relief:

(a)     Granting Plaintiff expedited discovery concerning the Concession Extension and PRHTA's financial condition;

(b)     Ordering PRHTA to allow Plaintiff to inspect PRHTA's financial records on an ongoing basis;

(c)     Appointing a provisional receiver over PRHTA;

(d)     Permanently enjoining PRHTA from committing any further breaches of fiduciary or contractual duties owed to Plaintiff;

(e)     Awarding Plaintiff costs and reasonable attorneys' fees; and

(f)     Granting Plaintiff any other relief this Court deems just and proper.

Dated: San Juan, Puerto Rico
        May 10, 2016

FERRAIUOLI LLC

By:  */s/ Roberto A. Cámara-Fuertes*
Roberto A. Cámara-Fuertes
USDC P.R. No. 219002
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com

MILBANK, TWEED, HADLEY & MCCLOY LLP

By:  */s/ Daniel M. Perry*
Dennis Dunne (*pro hac vice forthcoming*)
Michael L. Hirschfeld (*pro hac vice forthcoming*)
Daniel M. Perry (*pro hac vice forthcoming*)
Atara Miller (*pro hac vice forthcoming*)
Grant R. Mainland (*pro hac vice forthcoming*)
28 Liberty Street
New York, NY 10281
Telephone: (212) 530-5770
Facsimile: (212) 530-5770
Email: ddunne@milbank.com
        mhirschfeld@milbank.com
        dperry@milbank.com
        amiller@milbank.com
        gmainland@milbank.com

*Attorneys for Ambac Assurance Corporation*